[Cite as *State v. Nabors*, 2012-Ohio-4757.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                   :

     Plaintiff-Appellee                    :        C.A. CASE NO.    24582

v.                                              :        T.C. NO.    10CR2407

MICHAEL A. NABORS                               :        (Criminal appeal from
                                                         Common Pleas Court)

     Defendant-Appellant                   :

                                                :

. . . . . . . . . .

**O P I N I O N**

Rendered on the   12th   day of    October   , 2012.

. . . . . . . . . .

R. LYNN NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

CATHY J. WEITHMAN, Atty. Reg. No. 0020889, 201 West Court Street, Urbana, Ohio 43078
     Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}    This matter is before the Court on the Notice of Appeal of Michael Nabors, filed April 13, 2011.  On November 7, 2011, appointed counsel for Nabors submitted a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), alleging that no arguably meritorious issues exist for appeal, yet identifying two potential assignments of error for review.  On February 14,

2012, this Court issued a Decision and Entry concluding that the two potential assignments of error raised by appointed counsel have arguable merit and are not wholly frivolous. Accordingly, this Court set aside the *Anders* brief and appointed new counsel to represent Nabors.

{¶ 2} Nabors was originally indicted, on September 16, 2010, on one count of sexual conduct with a minor, in violation of R.C. 2907.04(A), a felony of the third degree. Nabors filed a motion to suppress, in which he asserted that the DNA sample he provided was subject to suppression because the search of his person was conducted without a warrant, and further that his statements were subject to suppression because they were obtained in violation of his *Miranda* rights. At the suppression hearing, counsel for Nabors withdrew the branch of the motion addressed to Nabors' statements.

{¶ 3} At the hearing, Detective Brian Lewis, a six-year employee of the Montgomery County Sheriff's Office, who also has eight years experience with the Dayton Police Department, testified that on December 24, 2009, Nabors "was a named suspect in an investigation involving sexual conduct with a fifteen-year-old female." Lewis testified that on that date, Nabors voluntarily appeared for an interview at the Sheriff's Office downtown after being advised by Lewis on the telephone that he was a named suspect in the investigation. Lewis stated that he did not know how Nabors got to the interview, but that he drove Nabors to work at its conclusion. Lewis testified that Nabors was not under arrest at the time, that he was not handcuffed, and that the door to the interview room remained open. Lewis stated that he did not *Mirandize* Nabors prior to the interview. According to Lewis, the interview "was voluntary. * * * a basic inquiry into the investigation of whether he * * * knew the female in question and his relationship with her." Lewis testified as follows:

> These * * * type of cases require a lot more follow-up as far as DNA and other type of situational type stuff to go further, typically. And based on the hundreds of cases I'd done prior to that, I knew that. That's why I agreed to take him to work afterwards. I pretty much had a general idea this was just going to be a - - an inquiry type of situation. And so at that point I chose not to Mirandize him.

**{¶ 4}** Lewis stated that at the start of the interview he asked Nabors to submit to a DNA swabbing. Lewis stated that due to "the nature of the investigation, that it's just normal protocol with myself getting DNA swabs from anybody's that (sic) a named suspect in case something comes up during the course of the investigation where that would be need[ed]. And regard - -with it being sexual in nature." Lewis stated that he "explained to him the situation of how the swabs are used; provided him the swabs and the envelope. And he did it - - he did the swabs of his mouth himself after I explained how to do it."

**{¶ 5}** The following exchange occurred:

Q. When you asked - - when you explained the DNA swabbing, did he consent?

A. Yes, ma'am.

Q. Did he hesitate at any point when you told him that you needed to take some DNA swabbing?

A. No, ma'am.

Q. Did you make any threats, promises or coerce the defendant into taking the DNA at that point?

A. No, ma'am.

Q. At any point did you insinuate that if the defendant refused to partake in the DNA swabbing that he would be under arrest?

A. No, ma'am.

Q. How many times do you think in your career you've requested someone to submit to a DNA swabbing?

\* \* \*

Q. Hundreds?

A. A hundred.

\* \* \*

Q. Has anyone ever refused to take a DNA swabbing from you before?

A. Yes, ma'am.

Q. And can you tell the Court what would happen if someone did refuse - -

\* \* \*

Q. - - to participate in this?

A. \* \* \* I wouldn't obtain one at that time. I'd have to write up a statement of facts for an affidavit for review by a judge of the correct municipality in an attempt to gain a search warrant.

Q. So at no point in this case did Michael Nabors state to you that he did not want to participate in the DNA swabbing?

A. No, he did not.

Q. And if he had said no, would you have released him and then gone about getting a search warrant?

A. Yes, ma'am.

Q. At any point did you assist him in doing the DNA swabbing, like physically assisting him?

A. No. Other than just explaining to him how to do it and then opening up the envelope.

Q. And then after the DNA swabbing occurred, that's when your investigative questioning took place and he was responsive to your questions; correct?

A. Yes, ma'am.

Q. And prior to the DNA swabbing or even after the DNA swabbing, did he state that he no longer wanted to participate, or ask for an attorney?

A. No, ma'am.

Q. And then after that was concluded and your investigating questions, you took him to work?

A. Yes ma'am.

{¶ 6} On cross-examination, Lewis stated that when Nabors appeared for the interview, Lewis was aware that Nabors had not had "significant contact with law enforcement before that day." Lewis stated that he secured his weapon in a drawer in his office across from the interview room, and that he was wearing his badge and his handcuffs in the course of the interview. Lewis stated that the interview room contained a table with a chair on each side, along with another chair in one corner. Lewis stated that he alone conducted the interview, and that he sat at the table with the door to the room directly behind him. Lewis stated that he told Nabors that he was free to leave at any time. When asked if he told Nabors that he did not have to submit to the DNA swabbing, Lewis responded, "I told him it was voluntary." Lewis stated that Nabors did not sign any sort of waiver. Lewis indicated that he advised Nabors that he was a named suspect. Lewis testified that he further advised Nabors to "be truthful. That's what I tell everybody - - be truthful. I'll do what I can for you. I just expect you to be truthful with me." The following exchange occurred:

Q. Tell me what you mean by you'll do what you can for them.

A. I mean, I'll be in his court. I mean, I expect people to be truthful with me. * * * when we do these cases, as they proceed further along, you know, there are a lot of questions that are asked. Was he cooperative?

In this case I knew Mr. Nabors, as you had pointed out that he had a clean record. So that stuff is able to be expressed by detectives during the course of future proceedings and that's what I meant by that.

Q. And you expressed to him that if he was cooperative with you and told you the truth, that you would help him out, meaning help him out with the prosecutor, help him out with the court process as he went through it?

A. Yeah, just let them know that he's been cooperative during the whole time. Absolutely.

Q. Okay. Almost kind of like a you do this for me, I'll do that for you sort of thing.

A. No, I would not describe it that way.

**{¶ 7}** At the conclusion of cross-examination, the court asked Lewis if he told Nabors that if he did not voluntarily provide a DNA sample, that Lewis would obtain a search warrant for the sample, and Lewis denied doing so.

**{¶ 8}** On March 2, 2011, in overruling Nabors' motion, the trial court announced its findings of fact and conclusions of law from the bench. The court initially noted that it found Lewis' testimony to be "credible and believable," and it incorporated the testimony "as the Court's factual conclusions." The court then held as follows:

In this case it is determined that Mr. Nabors voluntarily consented to the oral swab. In fact, Mr. Nabors did the swab himself. And I can find nothing in this record based upon Detective Lewis' testimony that would indicate that there was any duress, force, coercion, false promises, any implication that if the swab had been refused that the swab would have been immediately undertaken in any event.

I just can find nothing in this record based upon Detective Lewis' testimony that would lead me to the conclusion that the consent was the product of duress, coercion, either express or implied; that it came about as a result of threats, of force, or was granted only in submission to a claim of lawful authority.

**{¶ 9}** After Nabors pled no contest following the denial of his motion to suppress, the trial court sentenced him to five years of community control sanctions.

**{¶ 10}** Nabors herein repeats the two potential assignments of error set forth in his *Anders* brief. His first assigned error is as follows:

"THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS BECAUSE APPELLANT WAS COERCED INTO SUBMITTING THE DNA SAMPLE."

**{¶ 11}** As this Court has previously noted:

Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted) . At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence."

*State v. Hurt*, Montgomery App. No. 21009, 2006-Ohio-990.

*State v. Purser*, 2d Dist. Greene No. 2006 CA 14, 2007-Ohio-192, ¶ 11.

**{¶ 12}** The Fourth Amendment to the Untied States Constitution, which is applicable to the states through the Fourteenth Amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly

describing the place to   be searched, and the persons and things to be seized."   Violations of the Fourth Amendment require courts to apply the exclusionary rule, suppressing use of any evidence that was illegally obtained.   *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

{¶ 13}   As this Court has previously noted:

Searches conducted outside the judicial process, by officers lacking a prior judicial warrant, are per se unreasonable, subject to a few specifically established exceptions. * * * The burden is on the party seeking an exemption from the constitutional process to show the need for it. * * * Where the exemption on which the State relies involves consent, the State bears the burden to prove that consent was freely and voluntarily given. * * *

* * *

Whether consent is in fact voluntary or the product of duress or coercion, either express or implied, is a question of fact to be determined from the totality of the circumstances. * * *   Knowledge of the right to refuse consent is not a prerequisite to establishing voluntary consent, but is a relevant factor to be taken into account.   Consent to a search that is obtained by threats or force, or granted only in submission to a claim of lawful authority, is invalid. * * * Such "lawful authority" is an express or implied false claim by police that they can immediately proceed to make the search in any event. * * * .

*State v. Sears*, 2d Dist. Montgomery No. 20849, 2005-Ohio-3880, ¶ 34, 37.

{¶ 14}   Having thoroughly reviewed the record and considered the totality of the circumstances, we conclude that the State met its burden of establishing that Nabors voluntarily consented to provide a saliva sample for DNA testing.   We agree with the trial court that there is no evidence that Nabors' consent was the product of duress or coercion.   There is no evidence of threats or force, or that Nabors granted consent only in submission to a claim of lawful authority.   After having been advised by phone that he was a named suspect in an ongoing investigation, Nabors appeared voluntarily to be interviewed. Lewis explained the swabbing process to Nabors.   According to Lewis, whose testimony the trial court

found credible, Nabors did not hesitate to provide the sample or state that he did not want to participate in the swabbing procedure, and Lewis did not threaten, promise or coerce Nabors to provide the sample. Lewis stated that he did not assist Nabors in obtaining the sample other than opening the envelope and providing it and the swabs to Nabors. Nabors himself performed the swab. At no time before or after the swabbing did Nabors ask for an attorney. Lewis testified that he advised Nabors that the test was voluntary, and that he was free to leave at any time. In response to a question from the court, Lewis stated that he did not tell Nabors that he would obtain a warrant for the sample in the event Lewis refused consent. There being no merit to Nabors' first assigned error, it is overruled.

{¶ 15} Nabors' second assigned error is as follows:

"APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL, BECAUSE COUNSEL SHOULD NOT HAVE WITHDRAWN THE BRANCH OF APPELLANT'S MOTION TO SUPPRESS REGARDING HIS STATEMENTS TO DETECTIVE."

{¶ 16} Nabors' brief provides: "Counsel will not speculate on whether there was an issue of coercion or a violation of the dictates of *Miranda* but taken in the connection of the totality of the circumstances including the potential issues involving the suppression of DNA evidence, withdrawal of the remainder of the Motion to Suppress resulted [in] Appellant being denied effective assistance of counsel."

{¶ 17} As this Court has previously noted:

We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, and adopted by the Supreme Court of Ohio in *State v. Bradley* (1989), 42 Ohio St.3d 136, * * *. Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were

serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.* Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. (Internal citation omitted). *State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31.

**{¶ 18}** As this Court has further previously noted:

It is well established that the police are not required to administer *Miranda* warnings to every individual they question. (Internal citations omitted). The United States Supreme Court has held that police officers have a duty to advise a suspect of his rights pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 369-73, 86 S.Ct. 1602, 16 L.Ed.2d 694, when their questioning of the suspect rises to the level of custodial interrogation. (Internal citations omitted). A person is "in custody" only if, under the totality of the circumstances, a reasonable person in the same situation would feel that he was not free to leave. (Internal citations omitted). *State v.Wood*, 2d Dist. Greene No. 2006 CA 1, 2007-Ohio-1027, ¶ 43.

**{¶ 19}** We initially note that the record does not reflect whether any statements Nabors may have made to Lewis were inculpatory. Nabors does not point to any genuine admissibility problems with any statements, and we have no basis from the record before us to conclude that defense counsel's failure to seek suppression of the statements fell below an objective standard of reasonableness, and that but for the error, the outcome herein would have been otherwise. Defense counsel might have simply decided that an attempt to suppress Nabors' statements would have been futile, and debatable trial tactics cannot form the basis of a finding of ineffective assistance. Further, there is no indication, under the totality of the circumstances, that Lewis' questioning of Nabors rose to the level of custodial interrogation. Nabors voluntarily appeared for the interview, and at its conclusion, Lewis dropped him off at work. Nabors was not under arrest or handcuffed, the door to the interview room remained open in the course of the interview, and Lewis' weapon was secured in another room. Lewis advised Nabors that he was free to

leave at any time.  Lewis characterized the interview as "voluntary," and as we determined above, Lewis voluntarily consented to the DNA swabbing. There being no merit to Nabors' second assigned error, it is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

GRADY, P.J. and FAIN, J., concur.

Copies mailed to:

R. Lynn Nothstine
Cathy J. Weithman
Hon. Connie S. Price